Receipt Number
5 7 0 0 7 5

145

# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF MICHIGAN
### EASTERN DIVISION

MACQUARIE EQUIPMENT FINANCE,
LLC

        Plaintiff,

vs.

SCG CAPITAL CORPORATION

        Defendant.

Exhibits A – G

Case: 2:08-cv-11791
Judge: Taylor, Anna Diggs
MJ: Majzoub, Mona K
Filed: 04-29-2008 At 11:30 AM
CMP MACQUARIE EQUIPMENT V. SCG CAPT
IAL CORP (TAM)

---

Patrick F. Hickey (P36648)
Brittany M. Schultz (P63272)
Attorneys for Macquarie Equipment Finance
Dykema Gossett PLLC
400 Renaissance Center
Detroit, MI 48243
(313) 568-6800

---

## VERIFIED COMPLAINT FOR DECLARATORY AND OTHER RELIEF

Plaintiff Macquarie Equipment Finance, LLC ("Macquarie"), by its attorneys Dykema

Gossett PLLC, states for its Verified Complaint For Declaratory and Other Relief as follows:

### The Parties

1.    Plaintiff Macquarie Equipment Finance, LLC, formerly known as CIT

Technologies Corporation, d/b/a CIT Systems Leasing[1] (hereinafter referred to as "Macquarie"),

---

[1] Macquarie is an assignee of CIT Technologies Corporation, d/b/a CIT Systems Leasing.  Substantially all

1

is a Delaware limited liability company that maintains its principal place of business in Bloomfield Hills, Michigan. Macquarie is an equipment leasing and financing company, and leases data processing, material handling and other types of equipment to third party "lessees" or customers.

2.  Defendant SCG Capital Corporation, formerly known as Stamford Computer Group, Inc.[2] (hereinafter referred to as "SCG"), is a Connecticut corporation that maintains its principal place of business in Stamford, Connecticut. SCG is an equipment leasing company that enters into lease transactions with its own customers, and also purchases leases transactions and underlying equipment from leasing companies such as Macquarie.

### Jurisdiction and Venue

3.  This Court has subject matter jurisdiction in this matter pursuant to 28 U.S.C. § 1332 in that complete diversity of citizenship exists between the parties and the amount in controversy exceeds $75,000.00, exclusive of interest and costs.

4.  Venue is proper in the United States District Court for the Eastern District of Michigan, Southern Division, pursuant to 28 U.S.C. § 1391(a) and (c) because SCG is subject to personal jurisdiction in this district and a substantial part of the events or omissions giving rise to the claim occurred in this district.

---

of the assets of CIT Technologies Corporation, d/b/a CIT Systems Leasing were acquired by Macquarie effective January 1, 2008. CIT Technologies Corporation is now known as Macquarie Equipment Finance, LLC. The various agreements were assigned from CIT to Macquarie as part of that transaction.

[2] Stamford Computer Group, Inc. changed its name to SCG Capital Corporation on December 2, 2002.

2

5.     There is an actual case and controversy on which the judgment of the Court is required.  Declaratory relief is appropriate pursuant to 28 U.S.C. § 2201.

### General Allegations

The Agreements

6.     Beginning November 5, 2001, Macquarie and SCG entered into numerous agreements pursuant to which Macquarie sold various equipment lease agreements between Macquarie and GM, the related lease payments and the underlying equipment to SCG, and concurrently entered into billing and collecting agreements and remarketing agreements pursuant to which Macquarie would continue to bill GM, collect payments due from GM, remit received payments to SCG, and work with GM on various remarketing transactions with GM, which includes coordination of extensions or renewals of the existing lease, or selling the equipment to GM, and orchestrating the return of equipment from GM.  *See* Master Sale Agreement, Master Remarketing Agreement, Remarketing Schedules Nos. 8-9 and 11-13 and Billing and Collecting Agreements (hereinafter "the Agreements," attached hereto as **"Exhibits A-G,"** respectively), the originals of which are in the possession of SCG.

7.     From time to time, Macquarie sells equipment lease transactions (including the payments streams due under such leases) and the equipment leased thereunder to third party investors.  In connection with these sales to investors, Macquarie will agree to act as billing and collecting agent, whereby Macquarie continues to bill, and to collect payments from, the customer (and forward payments received to the investor).  Because Macquarie has a primary relationship with the customer, Macquarie also prefers to act as remarketing agent for the

3

investor, which requires Macquarie to act as the single interface with the customer in connection with all matters, including but not limited to equipment returns, relocations, lease extensions and renewals, and purchases by the customer of the leased equipment. Macquarie's decision to sell transactions to investors is made based on Macquarie's ability to control its relationship with the customer, as well as its negotiated right to both a origination fee and a remarketing fee consisting of a specified percentage of the remarketing proceeds resulting from the original lease transaction.

8.      At the time the parties entered into the Agreements, Macquarie assigned its rights under the leases to SCG.

9.      Macquarie (and its predecessors) has provided leasing of IT equipment, material handling equipment and other types of equipment to GM for over 20 years. During their relationship, Macquarie has entered into more than 1500 leases with GM, and has been considered among GM's top leasing providers. As a result, Macquarie has purchased and managed thousands of pieces of equipment leased to GM, both for its own account as well as for other investors.

10.      Pursuant to the Master Remarketing Agreement and each remarketing schedule thereto, upon the expiration or earlier termination of the applicable lease term, Macquarie remarkets the equipment on behalf of SCG. Remarketing includes communicating with GM and SCG to facilitate GM's ongoing requirements for the leased equipment. Accordingly, Macquarie provides GM with various alternatives relating to the equipment, including fixed term extensions, month-to-month extensions, and purchase options. Each lease may cover many

4

individual assets, and since Macquarie and SCG offer GM the flexibility to make remarketing choices on an asset by asset basis (instead of with respect to the entire lease), this process is extremely complicated and requires special attention to the detail. Each remarketing schedule corresponds to a specific group of leases purchased by SCG, and describes the equipment, the original location of the equipment, the lease term and the remarketing sharing percentages to be paid to Macquarie after SCG has recouped its required yield (on a schedule by schedule basis). After a piece of equipment is remarketed at the end of a lease term, the resulting proceeds are shared between Macquarie and SCG. In most cases, once SCG has recouped its yield, 60% of the remarketing proceeds are allocated to SCG and 40% of the remarketing proceeds are allocated to Macquarie.

11.     At this point in time, the original term has expired for approximately 70 of the GM leases sold to SCG, the equipment has been remarketed to GM, and based on GM commitments, SCG has received its required yield and Macquarie is now receiving its specified share of those remarketing proceeds.

12.     In addition to the Master Remarketing Agreement, SCG and Macquarie also entered into various Billing and Collecting Agreements. Pursuant to these agreements, Macquarie bills for, collects and forwards GM's lease payments to SCG upon receipt from GM. Macquarie and SCG agreed that all billing is to be consistent with Macquarie's usual billing practices. They further agreed that if General Motors failed to pay any lease payment when due, Macquarie may use its usual collection procedures to collect the lease payment.

13. The Billing and Collecting Agreement directs Macquarie to remit all payments received from General Motors to SCG within five days. The Agreement further provides that Macquarie will have no liability for any failure of General Motors to make payments or otherwise perform under the lease.

14. The Billing and Collecting Agreement also contains a Termination provision which states that SCG may only terminate Macquarie's billing and collecting duties if a "Termination Event" has occurred. A "Termination Event" is defined as the occurrence of: (a) Macquarie not complying with its billing and collecting obligations in any material respect and such noncompliance continues for a period of 10 days after notice is given; (b) a default under the lease occurs and is continuing; (c) Macquarie is insolvent; or (d) an involuntary petition is filed against Macquarie in bankruptcy. Five days after a termination notice has been given, Macquarie's billing and collecting rights are subject to termination.

15. Consistent with industry standards and practices regarding equipment rental and remarketing agreements, if a party believes a breach has occurred, the parties conduct a good faith and complete investigation of the facts and attempt to address any concerns or questions raised to resolve any discrepancies before giving notice to terminate an agreement.

The Termination Notice

16. For nearly seven (7) years after the agreements were entered into between Macquarie and SCG, Macquarie performed the billing, collection and remarketing obligations under the agreements without material objection. On March 27, 2008, nearly seven years after the agreements between Macquarie and SCG were first executed, SCG sent Macquarie

6

correspondence alleging that Macquarie was in default under the agreements and gave notice of its intent to terminate the Billing and Collecting Agreements, and the Master Remarketing Agreement and all Remarketing Schedules.

17.     Significantly, SCG also directed Macquarie to advise Macquarie's long standing customer, General Motors, that Macquarie would no longer service the equipment or leases and that future payments under the leases should be made directly to SCG.  In its correspondence, SCG claimed that:   (1) Macquarie failed to remit all payments received from General Motors within five days; (2) Macquarie failed to timely invoice General Motors and use its best efforts to collect payments; and (3) that several invoices (involving property taxes for the equipment) were rejected by General Motors because the equipment was no longer at the designated location and Macquarie failed to advise SCG of the change of location.   SCG claimed it was owed $635,616.87 in unpaid rental payments and property taxes.  In support of its allegations, SCG provided no detailed information, but merely provided Macquarie with an Aging Report in spreadsheet form which identified monies SCG believed it was owed.

18.     SCG's correspondence came as a surprise to Macquarie since just a few days earlier, Macquarie and SCG had participated in a telephone conference requested by Macquarie to discuss streamlining and improving the process of providing General Motors with the detail required to comply with GM's processing requirements.  At no time during this call did SCG state or suggest that Macquarie was in "default" or the agreements were subject to "termination." Immediately following that call, Macquarie summarized the discussion and outlined the steps

involved with processing the contracts and invoices for GM, and emailed the summary to Linda Gargano, an employee of SCG.

19.     Two days later, Ms. Gargano provided Macquarie with an aging report and requested that Macquarie contact her to reach a resolution as to streamlining the process under which SCG gets paid. She added that absent a viable solution or payment of a sizeable check, the matter would be referred to "legal." The Macquarie recipient of that email was on vacation but responded that same day and explained that Macquarie would contact her upon her return to the office. Nothing in this email indicated that SCG intended to threaten legal action or that the situation had escalated to the level of a serious dispute, particularly since SCG did not provide any meaningful information regarding what equipment was at issue, how much was in dispute, or the substance of any alleged breach for Macquarie to investigate.

20.     In a letter dated April 7, 2008 (but delivered to SCG on April 4, 2008), Macquarie responded to SCG's March 27, 2008 correspondence. Macquarie denied any alleged breach and further denied that SCG was justified in issuing any termination notice. It further advised SCG that: (1) SCG had several misconceptions regarding the equipment and the billing practices for General Motors; (2) SCG's records did not accurately reflect the terms of the General Motors equipment leases and therefore, incorrectly reflected when invoicing and payment accrued; and (3) Macquarie timely invoiced any executed contracts and forwarded monies received from General Motors to SCG in accordance with the timing required under the Billing and Collecting Agreements. Macquarie further advised SCG that its statements in SCG's March 27, 2008 correspondence clearly indicated that despite Macquarie's best efforts to define procedures

required to manage the GM account, a continued level of miscommunication existed between the parties. As a result, Macquarie invited SCG to visit its facility to conduct a detailed review of the alleged discrepancies regarding payment and to work collaboratively to improve the communication and reporting processes.

21.     Later that same day, Ms. Gargano, contacted Greg Goldstein, President of Macquarie, after receiving Macquarie's letter. The conversation was positive in tone and ended with Ms Gargano requesting detailed information supporting Macquarie's letter of April 7, 2008.

22.     Despite Macquarie's invitation for SCG to visit Macquarie's office to reconcile records, coupled with the conversation between Mr. Goldstein and Ms Gargano, that same day, on April 7, 2008, SCG issued notice to Macquarie that SCG was terminating the agreements.

23.     Macquarie responded and sent SCG documentation on April 8, 2008, containing its analysis of the payment status proving the inaccuracy of the SCG data and highlighting once again the need for both parties to work collaboratively. On April 10, 2008, SCG responded with another letter asking specific questions regarding Macquarie's April 8, 2008 analysis. This letter, like those preceding it, revealed the inaccuracy of SCG's records and assertions.

24.     On April 14, 2008, Macquarie contacted Larry Goichman, President of SCG, and discussed the complicated nature of the GM account and encouraged SCG to work with Macquarie to reconcile records. SCG expressed no interest in working with Macquarie or in reconciling misconceptions, and expressed its belief that Macquarie would not be entitled to further remarketing proceeds.

9

25.     The next day, April 15, 2008, SCG sent yet another letter to Macquarie maintaining its position that Macquarie was in default of the agreements.   SCG sent this communication without accepting Macquarie's offer to meet and confer at its facility regarding the alleged discrepancies identified by SCG.

26.     Macquarie responded to SCG by letter dated April 17, 2008, and emphasized that it had timely billed GM for payments due; that Macquarie used its usual billing and collection procedures with respect to obtaining payment on the equipment leases; that any payments received by Macquarie from GM were timely remitted to SCG; that any outstanding payments owed by GM were not due to any failure to bill, collect or advise SCG of the location of equipment by Macquarie, but were due to the complicated nature of GM's billing system (*e.g.* General Motors requires a specific billing format and has automated billing practices in certain circumstances); and the importance of regular communication by SCG.   In other words, Macquarie did not commit a material breach of any provision of the agreements.

27.     SCG delivered its fifth letter on April 23, 2008, and demanded that Macquarie instruct GM that SCG had terminated its rights under the agreements.   This letter included the threat that if Macquarie failed to do by 4:00 p.m. on Friday, April 25, 2008, SCG would deliver a default letter to GM.

28.     On April 25, 2008, counsel for Macquarie sent correspondence to SCG's counsel re-affirming Macquarie's position that it can and will demonstrate no material breach of the agreements occurred; there is no basis to terminate the agreements; and SCG must not contact Macquarie's client, General Motors, so not to damage their long-standing relationship. Ignoring

DYKEMA GOSSETT·A PROFESSIONAL LIMITED LIABILITY COMPANY·400 RENAISSANCE CENTER·DETROIT, MICHIGAN 48243-1668

Macquarie's counsel's correspondence, SCG then sent correspondence to General Motors that very same day stating SCG's relationship with Macquarie was terminated and that all future payments be made directly to SCG.

29.     The administration of the GM account is very cumbersome and complicated, and requires a collaborative and cooperative relationship between Macquarie and SCG, particularly since the parties' economic interests in the remarketing outcome are so clearly aligned.  SCG has been consistently unresponsive to Macquarie's requests for information necessary to efficiently manage the process.  SCG's attitude and behavior has contributed significantly to this dispute.

30.     Macquarie has not committed a material breach of any of Agreements.

31.     SCG's premature and unjustified attempt to terminate the various Agreements constitutes a breach of the Agreements and, further, is an apparent attempt to gain more advantageous rights under the Remarketing Agreements and Schedules, rather than to protect its legitimate interests in the Agreements.

**Count I**
**Declaratory Relief**

32.     The preceding paragraphs are incorporated by reference as if set forth fully herein. Macquarie incorporates the preceding paragraphs.

33.     The Agreements were valid and binding contracts between Macquarie and SCG.

34.     An actual controversy exists between the parties because SCG is not entitled to terminate the Agreements in that Macquarie has not committed any material breach of any provision in the Agreements.

11

35.     SCG's threatened or actual termination of the Agreements has or will cause Macquarie to suffer damages, including but not limited to sums due at following the remarketing of the equipment.

36.     Further, SCG's termination of the Billing and Collecting Agreement will cause irreparable harm to Macquarie because any notice of termination or other contact by SCG with General Motors, which incorrectly states that Macquarie has breached the Agreement with SCG, will interfere with and negatively impact the long-standing and significant relationship that Macquarie enjoys with General Motors.  Further, SCG's wrongful termination of the Agreement will negatively impact Macquarie's reputation and goodwill in the equipment leasing and finance industry.

WHEREFORE, Macquarie requests that this Court enter a declaratory judgment in favor of it and against Defendant SCG:

a.     Declaring that Macquarie has not committed any material breach of the Agreements.

b.     Declaring that SCG must honor the Agreements including the profit sharing provisions in the remarketing agreements and schedules and that Macquarie remain the sole contact with General Motors, including with respect to the billing and collection of payments under the equipment leases.

c.     Granting Macquarie such further relief as is just and proper.

## Count II
## Injunctive Relief

12

37.     The preceding paragraphs are incorporated by reference as if set forth fully herein. Macquarie incorporates the preceding paragraphs.

38.     Macquarie does not have an adequate remedy at law and will be unable to avoid irreparable harm if a temporary restraining order and preliminary injunction requiring SCG to not terminate the Agreements and not contact its long-standing client General Motors regarding billing and collection related to the equipment leases.

39.     Allowing SCG to terminate the Agreements and contact General Motors Corporation to notify them that Macquarie has been removed as the billing and collection manager for the leases will cause Macquarie irreparable harm in that it will negatively impact its relationship with General Motors and will damage its reputation in the industry.   This harm cannot be adequately compensated by damages.

40.     There is a substantial likelihood Macquarie will prevail on the merits of its claims.

41.     Macquarie will suffer significant harm if an injunction preserving the *status quo* is not issued.  SCG, on the other hand, would suffer no harm by the issuance of injunctive relief preserving the *status quo* until a final resolution of all issues between the parties.

42.     The public interest and the interests of the third party Customer, General Motors, will be harmed if an injunction is not issued.

43.     Macquarie is entitled to injunctive relief and an order compelling SCG to maintain the *status quo* while the parties' underlying disputes are resolved.

DYKEMA GOSSETT•A PROFESSIONAL LIMITED LIABILITY COMPANY•400 RENAISSANCE CENTER•DETROIT, MICHIGAN 48243-1668

### RELIEF REQUESTED

**WHEREFORE**, SCG respectfully requests that this Court issue preliminary and permanent injunctive relief prohibiting SCG from taking any action to terminate the Agreements or otherwise negatively impact the rights of Macquarie under the Agreement or the relationship it enjoys with its customer, General Motors.

Respectfully submitted,

DYKEMA GOSSETT PLLC

Patrick F. Hickey (P36648)
Brittany M. Schultz (P63272)
400 Renaissance Center
Detroit, Michigan  48243-1668
(313) 568-6800
(313) 568-6893 (fax)
phickey@dykema.com
bschultz@dykema.com

Attorneys for Plaintiff Macquarie
Equipment Finance, LLC

Dated:  April 29, 2008

14

## <u>VERIFICATION OF COMPLAINT FOR DECLARATORY AND OTHER RELIEF</u>

I, ___John Zimmeth___ for Macquarie Equipment Finance, LLC, having first been duly sworn, depose and state that I have read the foregoing Verified Complaint for Declaratory and Other Relief and verify the facts stated therein as true and accurate based on my knowledge, information and belief.

STATE OF MICHIGAN          )
                                         ) SS
COUNTY OF Oakland       )

The foregoing was acknowledged before me this 29th day of April, 2008 by

John Zimmeth .

___Patricia L. Sheldon___
Notary Public, State of mich., County of Oakland
My Commission Expires:
Acting in the County of

PATRICIA L. SHELDON
Notary Public, State of Michigan
County of Oakland
My Commission Expires April 15, 2011
Acting in the County of Oakland

12

## CERTIFICATE OF SERVICE

I certify under penalty of perjury that a copy of this document was served on Lori Simpson, Esq., Bishop Daneman & Simpson, LLC, 2 North Charles Street, Suite 500, Baltimore, Maryland 21201 and Marshall Goldberg, SCG Capital Corporation's resident agent at 600 Summer St., Stamford, CT  06901 by first-class U.S. mail and e-mail on April 29, 2008.

Dated: April 29, 2008

Laura Owens

BH01\868957.2
ID\BMS

16



SALE AFTER DEBT

## MASTER SALE AGREEMENT

Agreement dated as of December 28, 2001, by and between CIT TECHNOLOGIES CORPORATION, d/b/a CIT SYSTEMS LEASING, 2285 Franklin Road, Second Floor, Bloomfield Hills, Michigan 48302 ("Seller"), and STAMFORD COMPUTER GROUP INC., 74 West Park Place, Stamford, CT 06901 ("Purchaser").

### RECITALS

A.     Seller owns equipment (the "Equipment"). The Equipment is leased by Seller as lessor to a lessee (the "User") pursuant to a lease agreement (the "User Lease"). The Equipment, User and User Lease are as specified on an Equipment Schedule substantially in the form attached hereto as Exhibit A (an "Equipment Schedule"). In connection with its acquisition of the Equipment, Seller borrowed from the party identified in the Equipment Schedule as the Lender (the "Lender") an amount not in excess of the amount set forth in the Equipment Schedule as the Lender Indebtedness (the "Lender Indebtedness") (which amount is equal to the present value, discounted at the interest rate set forth in Section 4 c. (3) of the Equipment Schedule, attached hereto and marked Exhibit A, of the net rentals payable by the User under the User Lease during the period ("Firm Term") set forth in the Equipment Schedule and as security for repayment of the Lender Indebtedness: (a) granted to the Lender a security interest in the Equipment, and (b) assigned to the Lender some portion or all of the Net Rentals payable by the User under the User Lease during the Firm Term (collectively the "Senior Lien"). The agreements, instruments and other documents creating or otherwise affecting the Lender Indebtedness and the Senior Lien are referred to as the "Lender Lien Documents". The outstanding principal balance of the Lender Indebtedness as of the date of the Equipment Schedule (the "Outstanding Indebtedness") is an amount not in excess of the amount set forth in the Equipment Schedule as the "Outstanding Indebtedness" (which is equal to the present value of the remaining net rentals on the date hereof, discounted at the interest rate set forth in Section 4 c. (3) of the Equipment Schedule).

B.     Seller desires to sell to Purchaser, and Purchaser desires to purchase from Seller, the Equipment subject to the User Lease and the Senior Lien at the price and on the terms and conditions hereinafter set forth and as described in each Equipment Schedule executed from time to time pursuant to this Master Sale Agreement. Each Equipment Schedule shall incorporate all of the terms and conditions of this Master Sale Agreement, contain such additional terms as Seller and Purchaser shall agree upon, and constitute an agreement separate and distinct from this Master Sale Agreement and any other Equipment Schedule. In the event of a conflict between the provisions of this Master Sale Agreement and an Equipment Schedule, the provisions of the Equipment Schedule shall apply.

## 1. PURCHASE AND SALE OF EQUIPMENT, FEE.

1.01   Transfer of Equipment.  Seller hereby sells to Purchaser, and Purchaser hereby purchases from Seller on the closing date set forth in Section 6 of the Equipment Schedule (the "Closing Date"), the Equipment, subject to the rights of the User under the User Lease and of the Lender pursuant to the Senior Lien (collectively the "Prior Rights").

1.02   Assignment and Assumption of User Lease.  Seller hereby assigns to Purchaser, subject to the Prior Rights, all of the rights of Seller as lessor under the User Lease except for the rights, if any, excepted in the Equipment Schedule. Purchaser hereby accepts the assignment, and for the benefit of Seller, assumes and agrees to pay and perform when due the obligations of lessor under the User Lease.

excepted in the Equipment Schedule.  Purchaser hereby accepts the assignment, and for the benefit of Seller, assumes and agrees to pay and perform when due the obligations of lessor under the User Lease.

1.03    Payment of Purchase Price.  Purchaser shall, as consideration for the transfer of the Equipment and assignment of the User Lease, pay to or on behalf of Seller the amounts as set forth in Section 6 of the Equipment Schedule and shall assume the Outstanding Indebtedness (collectively, such payments and assumption are referred to as the "Purchase Price") according to the terms specified on the Equipment Schedule.

1.04    Bill of Sale.  Upon Purchaser's payment in full of the Purchase Price, Seller will deliver to Purchaser a Bill of Sale in substantially the form attached hereto as Exhibit B.

2.    ADDITIONS TO THE EQUIPMENT.  Seller may be, or become, the owner of additions to the Equipment defined in the User Lease as upgrades and/or additions.  Purchaser acknowledges that if the additions can be removed from the Equipment without damage to the Equipment and without decreasing the value of the Equipment, they shall be the property of Seller, and Purchaser shall have no interest either in: (i) such additions, or (ii) any User Lease proceeds allocable to such additions.

3. REPRESENTATIONS AND WARRANTIES OF THE SELLER.

3.01    Immediately prior to the sale of an item of Equipment hereunder, Seller will own, and will convey to Purchaser on the Closing Date, good and marketable title to that item of Equipment free and clear of any and all leases, liens, claims and encumbrances created by or through Seller other than the Prior Rights.  Each such item of Equipment will, immediately prior to the sale, be in good working order, repair and condition; the User Lease relating to that item will have been duly executed and delivered by Seller and to the best of Seller's knowledge, by the User, be in full force and effect, and constitute the valid and binding obligations of the parties thereto, enforceable in accordance with its terms (subject to bankruptcy insolvency and other laws affecting creditors' rights generally and to general principles of equity) and no material default will exist under the User Lease or the Senior Lien Documents.

3.02    Seller is duly and validly organized and existing in good standing under the laws of the State of Michigan.

3.03    Seller has the power and authority to enter into this Agreement and all other instruments and documents executed and delivered in connection with the transactions herein referred to and to carry out the sale and transfer of the Equipment to Purchaser.  There is no action, suit or proceeding pending against Seller before any court, administrative agency or other governmental authority which, if determined adversely to Seller, will adversely affect its ability to perform hereunder in a material way.  This Agreement constitutes the valid and binding obligation of Seller, enforceable against Seller in accordance with its terms, subject to bankruptcy, insolvency and other laws affecting creditors' rights generally and to general principles of equity.

3.04    The execution and delivery of this Master Sale Agreement and each Equipment Schedule by Seller and the performance by it of its obligations thereunder, have been duly authorized by all necessary action of Seller and do not violate or conflict with  (i) any law, order, injunction, or rule of any court, administrative agency or any governmental authority applicable to Seller, or  (ii) any agreement to which Seller is a party or by which Seller is bound.

3.05    SELLER MAKES NO OTHER WARRANTIES, EXPRESS OR IMPLIED, OF ANY KIND RELATING TO THE EQUIPMENT, INCLUDING ANY WARRANTY OF MERCHANTABILITY OR FITNESS FOR ANY PURPOSE OR WITH RESPECT TO PATENT OR COPYRIGHT INFRINGEMENT, OR THOSE ARISING BY STATUTE OR OTHERWISE IN LAW OR IN EQUITY OR FROM A COURSE OF DEALING OR USAGE OF TRADE.

3.06    The Lender Indebtedness does not exceed the amount set forth in the Equipment Schedule as the "Lender Indebtedness". The Outstanding Indebtedness does not exceed the amount designated in the Equipment Schedule as the "Outstanding Indebtedness". The terms of repayment of the Lender Indebtedness, plus interest thereon, are the terms of payment (the "Payment Terms") set forth as the "Payment Terms" in the Equipment Schedule. No default, or condition which, with or without the passage of time, the giving of notice or both, would constitute a default ("Potential Default"), exists under the Lender Lien Documents, by either Seller, or to the best of Seller's knowledge, the Lender; provided, however, that with respect to any act or omission within the control of the User that constitutes a default or Potential Default by Seller, such representation and warranty is made to the best of Seller's knowledge.

3.07    Seller will furnish to Purchaser a true, correct, and complete copy of each and every material agreement entered into by Seller in connection with Seller's original acquisition of the Equipment from the Manufacturer, Seller's leasing of the Equipment to the User, and the attachment of the Senior Lien.

4.   REPRESENTATIONS AND WARRANTIES OF THE PURCHASER.

The Purchaser represents and warrants to, and agrees with, the Seller as follows:

4.01    Purchaser is duly and validly organized and existing in good standing under the laws of the state of its incorporation.

4.02    Purchaser has the power and authority to enter into this Master Sale Agreement and each Equipment Schedule hereunder and to carry out the transactions contemplated therein. There is no action, suit or proceeding pending against Purchaser before any court, administrative agency or other governmental authority which, if determined adversely to Purchaser, will adversely affect its ability to perform hereunder in a material way. This Agreement constitutes the valid and binding obligation of Purchaser, enforceable against Purchaser in accordance with its terms, subject to bankruptcy, insolvency and other laws affecting creditors' rights generally and to general principles of equity.

4.03    The execution and delivery of this Master Sale Agreement and each Equipment Schedule by Purchaser and the performance by Purchaser of its obligations thereunder have been duly authorized by all necessary action of Purchaser and do not violate or conflict with  (i) any law, order, writ, injunction, or rule of any court, administrative agency or governmental authority applicable to Purchaser, or  (ii) any agreement to which Purchaser is a party or by which Purchaser is bound.

5.  TAXES.  Seller shall pay, or obtain payment when due, of all sales, use, property or other taxes (other than taxes based on the net income of Purchaser), now or hereafter imposed by or required to be paid to any jurisdiction in connection with Seller's original acquisition of the Equipment; provided, however, that Seller may in good faith (at its expense) contest in any reasonable manner the imposition of any such taxes, but only to the extent that such contest does not adversely affect the title of Purchaser to the Equipment. Purchaser will pay all taxes in connection with its purchase of the Equipment. If Purchaser is purchasing for resale, Purchaser will provide Seller with a resale exemption certificate.

5.1  Property Tax.  [Purchaser Files]  Purchaser acknowledges that it is responsible for the filing of all personal property tax returns with respect to the Equipment during the term of the User Lease and for the payment of all taxes indicated thereon.  Should Purchaser fail to make any such payment or fail to file such tax return, Seller has the right, but not the obligation, to make or do the same.  All reasonable costs incurred or expended by Seller and any tax payments or related payments of interest or penalties made by Seller pursuant to this Section shall be payable by Purchaser immediately upon invoice to Purchaser by Seller.

In the event that Seller has the responsibility to invoice the User for rent under User Lease, the parties understand that Seller will also invoice the User for personal property taxes with the remittance to Purchaser at Purchaser's address.

6.  BENEFITS OF REPRESENTATIONS, WARRANTIES, ETC.  Seller hereby assigns to Purchaser (to the extent assignable), and agrees to enforce for Purchaser's benefit (to the extent not assignable) at Purchaser's expense, the benefits (to the extent not heretofore assigned to the User or Lender) of all rights, warranties, representations, covenants and indemnities made to Seller by, or which Seller is entitled to enforce against, any predecessor in title to the Equipment.

7.  NONDISTURBANCE.  For Seller's benefit and for the express benefit of the User under its User Lease, so long as the User shall not be in default of any of the provisions of its User Lease, Purchaser shall not take any action to interfere with such User's quiet and peaceful possession of its Equipment and such User's right to have full and uninterrupted use and enjoyment of its Equipment pursuant to its User Lease.

8.  INDEMNIFICATION DAMAGES.  Purchaser and Seller shall indemnify the other and hold it harmless from and against any and all loss, cost, damage, injury or expense (including, without limitation, court costs and reasonable attorneys' fees) wheresoever and howsoever arising which the indemnified party may incur by reason of any breach by the indemnifying party of any of its warranties, representations, covenants, agreements or obligations set forth herein or in any documents executed in connection herewith.

Seller shall, in no event, be liable to Purchaser for any indirect, special or consequential damages caused, directly or indirectly, by the Equipment or any inadequacy thereof for any purposes, or any deficiency or defect therein, or the use or maintenance thereof, or any repairs, servicing or adjustments, or arising out of this Agreement or any Equipment Schedule.

9.  LENDER INDEBTEDNESS.  Seller agrees not to modify or amend (or cause to be modified or amended) any of the Lender Lien Documents.  Purchaser understands that Seller may not sell, transfer or assign Seller's interest in the Equipment or the User Lease unless such sale, transfer or assignment is subject and subordinate in all respects to the Senior Lien.  Purchaser hereby agrees, and agrees to cause each successor and assignee to agree, to subordinate its interest to the Lender's interest in the Equipment and the User Lease pursuant to documents satisfactory to the Lender and to execute Uniform Commercial Code financing statements, if so requested by Lender, for filing by Lender and to assume all of Seller's obligations under the Lender Lien Documents.

10.  ALLOCATION OF SALE AND/OR RESALE PROCEEDS.  In the event that additions have been added to the Equipment, the sale and/or re-lease proceeds of the Equipment and the additions will be allocated to the Equipment by multiplying those proceeds by a percentage calculated as follows:

Fair Market Value of Original Equipment Configuration
Fair Market Value of Current Equipment Configuration
(at the time of release or sale)

For purposes hereof, Fair Market Value is to be determined at the time of the re-lease or sale.

11. NON-CIRCUMVENTION.  Purchaser agrees that it will not, for the period of the User Lease defined in the Equipment Schedule hereto and/or any extension, renewal, directly or indirectly, transact or attempt to transact, business in any way with the User, except through Seller.

12. MISCELLANEOUS.

12.1   Survival.  The representations and warranties made herein shall survive the execution and delivery of this Agreement and the consummation of the transactions described herein.

12.2   Notices.   Any notice to either party by the other hereunder shall be given in writing and shall be deemed given on the earlier of the date the same as  (i) personally delivered with receipt acknowledged, or (ii) mailed by certified mail, return receipt requested, postage prepaid and addressed to the party for which it is intended at the address set forth at the head of this Agreement.  The place to which notices or copies of notices are to be given to either party may be changed from time to time by such party by written notice.

12.3   Governing Law.  This Agreement shall be governed by and interpreted under the laws of the State of Michigan applicable to contracts made and to be performed therein without giving effect to the principles of conflict laws thereof.

12.4   Counterparts.  This Agreement may be executed in one or more counterparts each of which shall be deemed an original, but all of which together shall constitute one and the same agreement.

12.5   Amendments.  This Agreement may be amended or varied only by a writing of even or subsequent date hereof and executed by Purchaser and Seller.

12.6   Further Assurances.  Each party, at its own expense, will deliver all further instruments and documents as may reasonably be requested by the other party in order to fully carry out the intent and accomplish the purposes of this Master Sale Agreement and the relevant Equipment Schedule.

12.7   Successors and Assigns.  Any assignment of this Agreement or subsequent transfer of any Equipment and any User Lease by Purchaser without the written consent of Seller shall be void.  The rights and obligations of the parties hereunder shall inure to the benefit of, and be binding and enforceable upon, the respective successors, assigns and transferees of either party.

IN WITNESS WHEREOF, the parties hereto have executed this Agreement on the day and year first above written.

PURCHASER:
STAMFORD COMPUTER GROUP INC.

BY: _____

ITS: _____President_____

DATED: _____12/28/01_____


SELLER:
CIT TECHNOLOGIES CORPORATION,
d/b/a CIT SYSTEMS LEASING

BY: _____Nancy A. Chandler_____
         Nancy A. Chandler
ITS: _____Senior Contract Specialist____

DATED: _____12/21/01_____

**EXHIBIT A**

Equipment Schedule No. _____ dated as of _____, 20_____
to Master Sale Agreement between STAMFORD COMPUTER GROUP, INC. Purchaser,
and CIT TECHNOLOGIES CORPORATION, d/b/a CIT SYSTEMS LEASING, Seller, dated as of
December 28, 2001

1.   <u>Purchaser.</u>

    (a)   Purchaser:       Stamford Computer Group Inc.

    (b)   Address:        74 West Park Place
                                  Stamford, CT  06901

2.   <u>Equipment.</u>

    (a)   Location:

    (b)   Description:

| <u>Quantity</u> | <u>Model/Feature</u> | <u>Description</u> | <u>Serial Number</u> |
|---|---|---|---|
| | | | |

3.   <u>User Lease.</u>

    (a)   User:

    (b)   Address:

    (c)   User Lease:  Equipment Schedule No. _____ dated _____, 20_____ to Master Lease dated _____, 20_____.

        (i)   Firm Term:  From the Rent Commencement Date (as defined in the User Lease) to _____, 20_____.

        (ii)  Rent: $_____ payable to CIT Technologies Corporation, d/b/a CIT Systems Leasing     monthly_____ quarterly_____ annually_____.

    (d)   Rights not assigned: Rent accruing prior to _____.

    (e)   Obligations not assumed:  Seller will invoice User for monthly rent plus any applicable sales/use tax with the remittance to Lender at Lender's address.  Seller will be responsible for filing returns and paying all sales/use tax when due.

4.    Lender Indebtedness

    (a)    Lender:

    (b)    Address:

    (c)    Payment Terms:

        (1)    Payments Made:    monthly _____; quarterly _____;
                        semi-annually _____; annually _____; in advance

        (2)    Payment Amount: $_____ per month

        (3)    Interest Rate:  _____ (_____%) percent included in
             payments shown in Subsection (2) above

        (4)    Date of Final Payment:

    (d)    Lender Indebtedness:  An amount not greater than $_____

    (e)    Outstanding Indebtedness:  An amount not greater than $_____

5.    Manufacturer.

    (a)    Manufacturer:

    (b)    Manufacturer Price:

    (c)    Manufacturer Indebtedness:

    (d)    Payment Terms:  Cash on Manufacturer Payment Date.

    (e)    Manufacturer Payment Date:  Thirty (30) days after Acceptance Date (as defined in User Lease)

6.    Purchase of Equipment

    (a)    Closing Date:

    (b)    Purchase Price:    $_____ - Outstanding Indebtedness
                       _____ - Equity
                       _____ - Fee
                       _____ - Carrying Costs
                     $_____ - Total Purchase Price

7.    Remarketing Agreement:    Yes_____    No_____

8.   <u>Third Party Brokerage Fee</u>:   $_____

     Payable by:  Seller_____    Purchaser_____

9.   <u>Assignment</u>:  Any assignment of this Schedule or subsequent transfer of the Equipment and User
     Lease by Purchaser without Seller's written consent shall be void.

10.  <u>Master Sale Agreement</u>.  This Equipment Schedule is issued pursuant to the Master Sale Agreement
     identified on Page 1.  All of the terms and conditions of the Master Sale Agreement are incorporated
     herein by reference.  By their execution of this Equipment Schedule, the parties hereby reaffirm all
     of the terms and conditions of the Master Sale Agreement except as modified hereby.

Seller:                                         Purchaser:
CIT TECHNOLOGIES CORPORATION,                   STAMFORD COMPUTER GROUP INC.
d/b/a CIT SYSTEMS LEASING

BY:_____                    BY:_____

NAME:_____                    NAME:_____

TITLE:_____                    TITLE:_____

DATE:_____                    DATE:_____

**EXHIBIT B**

**BILL OF SALE**

This Bill of Sale is issued by CIT TECHNOLOGIES CORPORATION, d/b/a CIT SYSTEMS LEASING ("Seller") to STAMFORD COMPUTER GROUP INC. ("Purchaser").

<u>Background</u>

Seller and Purchaser are parties to Equipment Schedule No. _____ dated _____, 20____ to a Master Sale Agreement (the "Sale Agreement") dated December 28, 2001 covering, among other things, the equipment described in the attached schedule (the "Equipment").

Unless the context hereof specifically indicates otherwise, each of the capitalized terms used herein shall have the meaning ascribed to it in the Sale Agreement between the parties.

1.    <u>Sale of Equipment</u>.

For valuable consideration, the receipt of which is acknowledged, Seller hereby sells the Equipment described in the attached schedule subject to the Prior Rights and further subject to Seller's security interest in the Equipment to secure payment of the purchase price.

IN WITNESS WHEREOF, Seller has executed this Bill of Sale as of the _____ day of _____, 20____.

Seller:
CIT TECHNOLOGIES CORPORATION,
d/b/a CIT SYSTEMS LEASING

By:_____

Name:_____

Title:_____

**SCHEDULE**

Equipment:

| Qty. | Mfg. | Type Model | Description | Serial No. |
|------|------|-----------|-------------|------------|



# MASTER REMARKETING AGREEMENT

The parties to this Agreement are CIT TECHNOLOGIES CORPORATION, d/b/a CIT SYSTEMS LEASING ("Manager"), 2285 Franklin Road, Bloomfield Hills, Michigan 48302 and STAMFORD COMPUTER GROUP INC. ("Owner"), 74 West Park Place, Stamford, CT 06901.

WHEREAS, Owner has purchased and will purchase in the future certain data processing equipment (the "Equipment") which is or will be on lease to third parties.

WHEREAS, Owner desires to engage Manager and Manager desires to accept such engagement to remarket and manage the Equipment on behalf of Owner under the terms and conditions set forth below:

NOW THEREFORE, Owner and Manager agree as follows:

1. Appointment: Owner hereby appoints Manager as its exclusive agent to remarket and manage the Equipment for Owner, and Manager accepts the appointment and agrees to use its best efforts to perform certain remarketing and managerial services so long as it is to the User of said Equipment as more fully described in this Agreement. Owner shall have the right to remarket the Equipment to a party other than the User. Remarketing shall include the sale or re-lease of Equipment to the person leasing the Equipment immediately prior to remarketing ("User"). The parties understand and agree that Manager is engaged in the business of buying, selling and leasing Equipment similar to Owner's for other owners and for itself and that Manager shall not be restricted from remarketing and managing other Equipment similar to Owner's for its own account or the account of others and further shall not be obligated to submit to Owner, for its acceptance or rejection, any particular Offer.

2. Schedules; Availability of Equipment for Remarketing: Remarketing Schedules ("Remarketing Schedule") shall be issued from time to time under this Agreement. Each Remarketing Schedule shall be substantially in the form of Exhibit A hereto, shall be consecutively numbered and shall set forth the description and location of the Equipment, Availability Date of the Equipment, Manager's Remarketing Fees and other terms. The Equipment will be available for sale or re-lease as of the date set forth on the Remarketing Schedule ("Availability Date").

3. Remarketing Procedures, Services and Reimbursed Expenses: The procedure for remarketing the Equipment will be as follows:

As of the Availability Date, Manager will solicit firm Offers ("Offers") from Users for the sale and/or re-lease of the Equipment. Manager will promptly inform Owner of such Offers in writing via certified mail. Owner will promptly (and in no event later than five (5) business days after receipt of an Offer) notify Manager if it accepts or rejects an Offer. Owner's rejection notice shall state its reasons for such rejection. Failure of Owner to accept or reject an Offer shall be deemed an acceptance.

Upon Owner's acceptance of an Offer, Manager will promptly prepare and arrange for the execution of commercially standard documentation for the sale or re-lease of the Equipment, the terms and conditions of which shall be within the sole and reasonable discretion of Manager. Owner hereby appoints Manager its agent to execute on its behalf the sale and/or re-lease documents in connection with the accepted sale and/or re-lease of the Equipment and to bill and collect all amounts attributable to such sale and/or re-lease from User.

In the event Manager assists in remarketing equipment to someone other than User, and equipment has left User's location, Owner agrees to reimburse Manager for all reasonable expenses incurred in performing the services set forth below in remarketing the Equipment ("Remarketing Expenses"). Manager shall seek Owner's prior approval for such expenses  which approval shall be deemed given in the event Owner fails to respond to Manager's request after five (5) business days. Remarketing Expenses include commercially reasonable costs of transportation, reconfiguration, refurbishment, storage, audit, transportation and rigging, deinstallation, installation, insurance and other reasonable expenses arising from the sale or re-lease of the Equipment.  Manager shall bill Owner for Remarketing Expenses which Owner agrees to promptly pay.  Manager agrees to arrange for these services at commercially reasonable prices and upon commercially reasonable terms and conditions.  For the purposes of this Agreement, the term "Net Remarketing Proceeds" shall mean the gross sales proceeds, or re-lease proceeds, less Remarketing Expenses described above.

4.  Administration; Billing and Collecting; Distribution of Equipment Proceeds:  Manager agrees on Owner's behalf and at Manager's expense  (a) to timely invoice:  (i) Users under a re-lease of the Equipment for Rent and other sums due to be paid by them to Owner ("Equipment Lease Proceeds"), (ii) Users under a sale of the Equipment for all sale proceeds and other sums due to be paid to Owner ("Equipment Sale Proceeds", collectively "Equipment Proceeds");  (b) use its best efforts (subject to the rights of any party holding a lien or security interest superior to that of Owner (the "Senior Lienholder")) to collect the Equipment Proceeds; and  (c) to distribute the Equipment Proceeds as follows: (i) first, to the payment to Manager of Remarketing Expenses to the extent not previously paid by Owner and all sales/use taxes Manager is filing and paying; (ii) second, to the payment to Manager of the Remarketing Fee, as set forth on the appropriate Remarketing Schedule; (iii) third, to the payment to Manager for other taxes not collectible from the User (i.e., Indiana Gross Income Tax, Washington Business and Occupation Tax, etc.), and (iv) fourth, as directed by Owner.

Equipment Proceeds shall not include the proceeds of a User Re-lease or Sale which are attributed to Equipment other than Owner Equipment including, but not limited to, Upgrades, features and other additions to the Equipment ("Non-Owner Equipment").  Owner expressly agrees that it has and shall have no ownership interest whatsoever in Non-Owner Equipment and the proceeds thereof.

5.  Other Manager Services:  Manager agrees to file and pay, or cause User to file and pay, all sales and/or use tax returns arising from a User re-lease, renewal or sale of the Equipment, only if Manager is the collecting party of the Equipment Proceeds.

At Owner's request and expense, Manager will use reasonable efforts to enforce Remedies (including lawful repossession) in the event of an Event of Default by User under a User Re-lease or User Sale Agreement subject, however, to the rights of a Senior Lienholder, if any.  Expenses incurred under this Section 5 will be promptly reimbursed by Owner.

6.  Property Tax:  Owner acknowledges that it is responsible for the filing of all personal property tax returns with in respect to the Equipment during the term of the User Lease or any renewal term and for the payment of all taxes indicated thereon.  Should Owner fail to make any such payment or fail to file such tax return, Manager has the right, but not the obligation, to make or do the same.  All reasonable costs incurred or expended by Manager and any tax payments or related payments of interest or penalties made by Manager pursuant to this Section shall be payable by Owner immediately upon invoice to Owner by Manager.

In the event that Manager has the responsibility of invoicing the User Lessee for Basic Rent, the parties understand that Manager will also invoice the User Lessee for personal property taxes with the "remit to" address of Owner.

7. <u>Remarketing Fee</u>:  As compensation for the remarketing services performed hereunder by Manager, Owner agrees to pay to Manager a fee, the amount of which shall be set forth on each Remarketing Schedule issued hereunder ("Remarketing Fee").  The Remarketing Fee shall be paid to Manager directly from Equipment Proceeds as more fully set forth in paragraph 4.  Manager shall be entitled to receive the Remarketing Fee in the event Owner re-leases or sells the Equipment to a User who was the original User of the Equipment or any related entity, successor assignee or sublessee, of such User. The Remarketing Fee shall be due and payable, in the case of a sale, on the date the sale occurs, and in the case of a re-lease, on the date the renewal lease commences.  For purposes of calculating the Net Remarketing proceeds stipulated in the applicable Remarketing Schedule hereto, such renewal lease shall be present valued at the then current prime interest rate.

8. <u>Quiet Enjoyment</u>:  Provided User is not in default under the terms and conditions of the applicable sale or re-lease agreement, Manager and Owner agree that neither shall disturb the User's right of quiet enjoyment and use of the Equipment.

9. <u>Termination</u>:  Any Remarketing Schedule issued pursuant to this Remarketing Agreement may only be terminated upon thirty (30) days prior written notice from the party terminating to the other party for failure of the other party to substantially perform under that Remarketing Schedule.  Termination of one Remarketing Schedule shall not constitute termination of any other Remarketing Schedule or this Remarketing Agreement which shall continue in effect so long as any Remarketing Schedule shall remain in effect. A Termination shall be effective thirty (30) days from receipt of the required notice.   No termination shall affect Manager's right to  (a) Manager's Fee as set forth in Paragraph 6; and  (b) Manager's reimbursement for Remarketing Expenses incurred prior to the effective date of termination.

10. <u>Allocation of Sale and/or Re-lease Proceeds</u>:  In the event there have been additions to the Equipment ("Upgrades"), the sale and/or re-lease proceeds of the Equipment and the Upgrade(s) will be allocated to the Equipment by multiplying those proceeds by a percentage calculated as follows:

<u>Fair Market Value of Original Equipment Configuration</u>
Fair Market Value of Current Equipment Configuration including Upgrades
(at the time of re-lease or sale)

For purposes hereof, Fair Market Value is to be determined at the time of the re-lease or sale.

11. <u>Non-Circumvention</u>:  Owner agrees that it shall not contact or negotiate with the User or subsequent User concerning any Upgrade, addition or feature order to be added to the Equipment, any purchase of the Equipment, any renewal or extension of the Lease or any re-lease and manager shall deal exclusively with User or subsequent User with regard to the Equipment.

12. <u>Substitution</u>:  Owner agrees that the Equipment may be replaced, at no penalty to the User, with Equipment which is lien free and of the same model, type and configuration, and manufacturer as the Equipment, and which will qualify as a "Like Kind Exchange" under the Internal Revenue Code of 1986, as amended.

13. Miscellaneous:

A. Amendments: This Agreement and any Remarketing Schedule may only be amended by a writing executed by the party against whom enforcement of the amendment is sought.

B. Arbitration: Any dispute arising out of or relating to this Remarketing Agreement including, but not limited to, its breach or interpretation, shall be settled by arbitration. The arbitrator shall be selected in accordance with the procedures and shall be conducted in Detroit, Michigan under the rules and regulations of the American Arbitration Association. Any judgment entered by the arbitrator shall be a final binding judgment on the parties enforceable in any court having jurisdiction. The cost of such arbitration shall be paid equally by Manager and Owner.

C. Captions: Captions of paragraphs in this Agreement have been inserted for convenience only and are not intended to limit or affect the interpretation of construction of this Agreement.

D. Counterparts: This Agreement and any Remarketing Schedule may be executed in one or more counterparts, each of which shall be deemed an original but all of which together shall constitute one agreement.

E. Entire Agreement: This Agreement supersedes all previous arrangements or agreements, whether written or oral, and comprises the entire Agreement of the parties.

F. Governing Law: This Agreement and each Remarketing Schedule issued hereunder shall be governed by and interpreted under the laws applicable to contracts made or performed in the State of Michigan without giving effect to the principles of conflicts of laws.

G. Severability: The invalidity or unenforceability of any provision of this Agreement shall not affect the validity or enforceability of any other provision.

H. Survival: The representations and agreements in this Agreement shall survive the execution and delivery of this Agreement and consummation of any transaction hereunder. This Agreement shall be binding on and inure to the benefit of the parties, their respective successors and assigns.

This Master Remarketing Agreement shall be effective as of November 5, 2001.


CIT TECHNOLOGIES CORPORATION,
d/b/a CIT SYSTEMS LEASING
Manager

By:_____

Title:   Senior Contract Specialist


STAMFORD COMPUTER GROUP INC.
Owner

By:_____

Title:  President_____

## EXHIBIT A

### REMARKETING SCHEDULE NO. _____
#### Dated _____, 20____

Description of Equipment:

Qty.    Mfg.    Equipment Type    Model/Feature    Description                Serial No.

Location of Equipment:        _____
                             _____
                             _____
                             _____
                             Attn:_____
                             Phone:_____

                             (Equipment Schedule No. _____ dated _____, 20_____ )

Availability Date:        _____, 20____; or the first day following Termination Date
of the Lease if an Early Termination Option has been exercised by the User.

Remarketing Fee:

a) Owner shall receive 100% of Net Remarketing Proceeds until Owner shall realize $_____
("Investors Required Return").  Thereafter Net Remarketing Proceeds shall be allocated as follows:

                _____% to Owner

                _____% to Manager


b)  In the event of an Early Termination of the Lease or Partial Termination of the Equipment, the Investors
Required Return shall be adjusted accordingly.

                                    OR

_____% of Net Remarketing Proceeds shall be allocated to Manager;

Remarketing Expenses:  As part of Remarketing Expenses hereunder, Manager shall be reimbursed for
sales commissions paid in accordance with its applicable sales commission plan.

This Remarketing Schedule is issued pursuant to the Master Remarketing Agreement dated November 5, 2001 between CIT TECHNOLOGIES CORPORATION, d/b/a CIT SYSTEMS LEASING as Manager and STAMFORD COMPUTER GROUP INC. as Owner and incorporates by reference all of the terms and conditions of that Agreement.

CIT TECHNOLOGIES CORPORATION,
d/b/a CIT SYSTEMS LEASING
Manager

STAMFORD COMPUTER GROUP INC.
Owner

BY:_____

BY:_____

ITS:_____

ITS:_____

DATE:_____

DATE:_____



## REMARKETING SCHEDULE NO. 8
### Dated as of July 2, 2002

Description of Equipment:

| Qty | Mfg | Type | Description | Serial Numbers |
|-----|-----|------|-------------|----------------|

SEE EXHIBIT B ATTACHED HERETO AND MADE A PART HEREOF

Location of Equipment:       General Motors Corporation
                             30009 Van Dyke
                             Warren, MI 48090

Availability Date:       The "Term Date" as set forth in Exhibit A attached hereto and made a part hereof;
or the first day following Termination Date of the Lease if an Early Termination Option has been exercised
by the User.

Remarketing Fee:

a) Owner shall receive 100% of Net Remarketing Proceeds until Owner shall realize the Thresholds as set
forth in Exhibit A attached hereto ("Investors Required Return").  Thereafter Net Remarketing Proceeds shall
be allocated as follows:

                    60% to Owner
                    40% to Manager

b)  In the event of an Early Termination of the Lease or Partial Termination of the Equipment, the Investors
Required Return shall be adjusted accordingly.

      This Remarketing Schedule is issued pursuant to the Master Remarketing Agreement dated
November 5, 2001 between CIT TECHNOLOGIES CORPORATION, d/b/a CIT SYSTEMS LEASING as
Manager and STAMFORD COMPUTER GROUP INC. as Owner and incorporates by reference all of the
terms and conditions of that Agreement.

CIT TECHNOLOGIES CORPORATION,
d/b/a CIT SYSTEMS LEASING                    STAMFORD COMPUTER GROUP INC.
Manager                                      Owner

BY: _Nancy A. Chandler_                      BY: _____

ITS:    Senior Contract Specialist           ITS: _President_

DATE: July 2, 2002                           DATE: _7/2/02_

EXHIBIT A

| Transaction No. | Schedule No. | Schedule Date | Monthly Rental | Term | Start Date | Final Payment Date | Term Date | Location (City) | State | Cost | Threshold |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 9910669-000 | 392 | January 2, 2002 | $1,053.15 | 60 | 1/1/02 | 12/1/06 | 12/31/06 | Mansfield | OH | $59,500.00 | $12,184.54 |
| 9910723-000 | 398 | Janaury 8, 2002 | $293.92 | 60 | 1/1/02 | 12/1/06 | 12/31/06 | Doraville | GA | $16,605.50 | $3,400.51 |
| 9910949-000 | 420 | January 11, 2002 | $1,004.55 | 60 | 2/1/02 | 1/1/07 | 1/31/07 | Saginaw | MI | $53,005.00 | $11,062.54 |
| 9911064-000 | 434 | March 13, 2002 | 60 @ $978.12 12 @ $899.87 | 72 | 4/1/02 | 3/1/08 | 3/31/08 | Bolingbrook | IL | $54,665.00 | $14,882.63 |
| 9911070-000 | 437 | January 11, 2002 | $915.08 | 60 | 1/1/02 | 1/31/07 | 1/31/07 | Saginaw | MI | $47,705.00 | $9,956.38 |
| 9911192-000 | 448 | February 12, 2002 | $616.41 | 60 | 2/1/02 | 2/1/07 | 2/28/07 | Langhorne | PA | $32,135.00 | $6,835.36 |
| 9911222-000 | 452 | February 4, 2002 | $488.96 | 60 | 2/1/02 | 1/1/07 | 1/31/07 | Moraine | OH | $25,800.00 | $5,384.65 |
| 9911315-000 | 458 | February 12, 2002 | $200.25 | 60 | 3/1/02 | 2/1/07 | 2/28/07 | Langhorne | PA | $10,439.35 | $2,220.51 |
| 9911323-000 | 464 | January 7, 2002 | $537.27 | 36 | 2/1/02 | 1/1/04 | 1/31/04 | Ypsilanti | MI | $19,860.00 | $2,628.05 |
| 9911464-000 | 474 | January 16, 2002 | $228.85 | 60 | 1/1/02 | 12/1/06 | 12/31/06 | Roanoke | TX | $12,075.00 | $2,472.75 |
| 9911549-000 | 481 | February 11, 2002 | $942.28 | 60 | 3/1/02 | 2/1/07 | 2/28/07 | Indianapolis | IN | $49,123.00 | $10,448.84 |
| 9911541-000 | 485 | February 25, 2002 | $326.17 | 60 | 3/1/02 | 2/1/07 | 2/28/07 | Massena | NY | $17,210.12 | $3,660.73 |
| 9911586-000 | 492 | April 2, 2002 | $227.90 | 60 | 4/1/02 | 3/1/07 | 3/31/07 | Bolingbrook | IL | $12,025.00 | $2,606.84 |
| 9911620-000 | 495 | January 11, 2002 | $288.94 | 60 | 2/1/02 | 1/1/07 | 1/31/07 | Saginaw | MI | $15,063.00 | $3,143.76 |
| 9911621-000 | 496 | February 12, 2002 | $154.18 | 60 | 3/1/02 | 2/1/07 | 2/28/07 | Detroit | MI | $8,038.00 | $1,709.74 |
| 9911627-000 | 501 | February 26, 2002 | $264.63 | 60 | 3/1/02 | 2/1/07 | 2/28/07 | Flint | MI | $13,963.00 | $2,970.03 |
| 9911629-000 | 503 | February 4, 2002 | $1,284.83 | 60 | 1/1/02 | 12/1/06 | 12/31/06 | Flint | MI | $67,794.00 | $13,883.02 |
| 9911701-000 | 505 | January 22, 2002 | $408.69 | 60 | 2/1/02 | 1/1/07 | 1/31/07 | Oklahoma City | OK | $21,306.00 | $4,446.72 |
| 9911704-000 | 508 | February 8, 2002 | $931.49 | 60 | 2/1/02 | 1/1/07 | 1/31/07 | Detroit | MI | $49,150.00 | $10,257.96 |
| 9911707-000 | 510 | March 4, 2002 | $2,396.27 | 60 | 3/1/02 | 2/1/07 | 2/28/07 | Waterford | MI | $126,439.00 | $26,894.52 |
| 9911815-000 | 512 | February 12, 2002 | $3,576.48 | 60 | 3/1/02 | 2/1/07 | 2/28/07 | Wentzville | MO | $186,450.00 | $39,659.32 |
| 9911816-000 | 513 | February 11, 2002 | $748.56 | 60 | 3/1/02 | 8/30/07 | 2/28/07 | Wentzville | MO | $39,024.00 | $8,300.69 |
| 9911817-000 | 514 | February 11, 2002 | $1,193.79 | 60 | 3/1/02 | 2/1/07 | 2/28/07 | Bay City | MI | $62,235.00 | $13,237.84 |
| 9911988-000 | 518 | March 26, 2002 | $1,246.06 | 60 | 4/1/02 | 3/1/07 | 3/31/07 | Oklahoma City | OK | $64,960.00 | $14,028.31 |
| 9911990-000 | 519 | March 26, 2002 | $487.70 | 60 | 4/1/02 | 3/1/07 | 3/31/07 | Bowling Green | KY | $25,425.00 | $5,511.74 |
| 9911993-000 | 520 | March 26, 2002 | $1,716.71 | 60 | 4/1/02 | 3/1/07 | 3/31/07 | Bowling Green | KY | $89,496.00 | $19,401.34 |
| 9911994-000 | 521 | March 26, 2002 | $623.03 | 60 | 4/1/02 | 3/1/07 | 3/31/07 | Oklahoma City | OK | $32,480.00 | $7,041.15 |
| 9911976-000 | 522 | March 26, 2002 | $3,736.58 | 60 | 4/1/02 | 3/1/07 | 3/31/07 | Oklahoma City | OK | $194,796.00 | $42,228.71 |
| 9911978-000 | 523 | March 26, 2002 | $3,293.55 | 60 | 4/1/02 | 3/1/07 | 3/31/07 | Oklahoma City | OK | $171,700.00 | $37,221.87 |
| 9911980-000 | 524 | March 26, 2002 | $1,553.28 | 60 | 3/1/02 | 2/1/07 | 2/28/07 | Oklahoma City | OK | $80,976.00 | $17,224.21 |
| 9911981-000 | 525 | March 21, 2002 | $1,406.33 | 60 | 4/1/02 | 3/1/07 | 3/31/07 | Ypsilanti | MI | $73,315.00 | $15,893.55 |
| 9911983-000 | 526 | March 27, 2002 | $3,862.60 | 60 | 4/1/02 | 3/1/07 | 3/31/07 | Ypsilanti | MI | $201,366.00 | $43,653.01 |
| 9911992-000 | 529 | March 21, 2002 | $129.96 | 60 | 4/1/02 | 3/1/07 | 3/31/07 | Ypsilanti | MI | $6,775.00 | $1,468.71 |
| 9911977-000 | 531 | March 21, 2002 | $786.46 | 60 | 4/1/02 | 3/1/07 | 3/31/07 | Defiance | OH | $41,000.00 | $8,888.16 |
| 9911979-000 | 532 | February 21, 2002 | $307.95 | 60 | 3/1/02 | 2/1/07 | 2/28/07 | Indianapolis | IN | $16,054.00 | $3,414.81 |
| 9912046-000 | 535 | March 21, 2002 | $1,704.13 | 60 | 3/1/02 | 2/1/07 | 2/28/07 | Wentzville | MO | $88,840.00 | $19,259.13 |
| 9912047-000 | 536 | March 11, 2002 | $125.53 | 60 | 4/1/02 | 3/1/07 | 3/31/07 | Toledo | OH | $6,544.00 | $1,418.63 |
| 9912048-000 | 537 | March 11, 2002 | $715.30 | 60 | 4/1/02 | 3/1/07 | 3/31/07 | Warren | MI | $37,290.00 | $8,083.88 |
| 9912177-000 | 543 | February 21, 2002 | $143.06 | 60 | 3/1/02 | 2/1/07 | 2/28/07 | Wentzville | MO | $7,458.00 | $1,586.36 |

## EXHIBIT B

### SCHEDULE NO. 392

Equipment Location: Mansfield Plant/ Dock #1, 2525 W. Fourth Street, Mansfield, OH 44906.

| GM PR NUMBER | MANUFACTURER | SERIAL NUMBERS | TYPE AND MODEL OF EQUIPMENT | NUMBER OF UNITS | COST PER UNIT |
|---|---|---|---|---|---|
| PRA20230 001 | Marvel | E-505612PC | Band Saw Machine Model 81A12PC | 1 | $59,500.00 |

### SCHEDULE NO. 398

Equipment Location: GM Doraville Assembly, 3900 Motors Industial Way, Doraville, GA 30360.

| GM PR NUMBER | MANUFACTURER | SERIAL NUMBERS | TYPE AND MODEL OF EQUIPMENT | NUMBER OF UNITS | COST PER UNIT |
|---|---|---|---|---|---|
| PRVB3165 001 | PerkinElmer | 040S1060709 | Atomic Absorption Sprectrometers Model AANALYST 100 | 1 | $16,605.50 |

### SCHEDULE NO. 420

Equipment Location: SMCO Saginaw, 1629 N. Washington Ave. Saginaw, MI 48601.

| GM PR NUMBER | MANUFACTURER | SERIAL NUMBERS | TYPE AND MODEL OF EQUIPMENT | NUMBER OF UNITS | COST PER UNIT |
|---|---|---|---|---|---|
| PR0019PS 001 | Taylor-Dunn | 149750, 149751, 149752, 149753, 149754 | Weld Carts Model B2-54 | 5 | $10,601.00 |

### SCHEDULE NO. 434

Equipment Location: GM SPO 1355 Remington Blvd. Bolingbrook, IL 60440.

| GM PR NUMBER | MANUFACTURER | SERIAL NUMBERS | TYPE AND MODEL OF EQUIPMENT | NUMBER OF UNITS | COST PER UNIT |
|---|---|---|---|---|---|
| PRIG3754 001 | Galbreath | SC4563 | Pre-Crusher Compactor Model APC 426 | 1 | $43,875.00 |
| PRIG3754 001 | Galbreath | 96670 96671 | Compaction Container Model PR-2290 | 2 | $5,395.00 |

**SCHEDULE NO. 437**

Equipment Location: SMCO Saginaw, 1629 N. Washington Ave. Saginaw, MI 48601.

| GM PR NUMBER | MANUFACTURER | SERIAL NUMBERS | TYPE AND MODEL OF EQUIPMENT | NUMBER OF UNITS | COST PER UNIT |
|---|---|---|---|---|---|
| PR0017PS 001 | Taylor-Dunn | 149760, 149761, 149762, 149763, 149764 | Burden Carrier Model B2-54 | 5 | $9,541.00 |

**SCHEDULE NO. 448**

Equipment Location: SPO Philadelphia PDC #52, 200 Cabot Blvd. East, Langhorn, PA 19030.

| GM PR NUMBER | MANUFACTURER | SERIAL NUMBERS | TYPE AND MODEL OF EQUIPMENT | NUMBER OF UNITS | COST PER UNIT |
|---|---|---|---|---|---|
| PR000152 001 | Tennant | 3078 | Sweeper Scrubber Model M8300 | 1 | $32,135.00 |

**SCHEDULE NO. 452**

Equipment Location: GMTG Moraine Assembly, 2601 W. Stroop Road, Moraine, OH 45439.

| GM PR NUMBER | MANUFACTURER | SERIAL NUMBERS | TYPE AND MODEL OF EQUIPMENT | NUMBER OF UNITS | COST PER UNIT |
|---|---|---|---|---|---|
| PR0027MA 001 | Bobcat | 10321N | Front End Loader Model 1500D 700 Series | 1 | $25,800.00 |

**SCHEDULE NO. 458**

Equipment Location: SPO Philadelphia PDC #52, 200 Cabot Blvd. East, Langhorn, PA 19030.

| GM PR NUMBER | MANUFACTURER | SERIAL NUMBERS | TYPE AND MODEL OF EQUIPMENT | NUMBER OF UNITS | COST PER UNIT |
|---|---|---|---|---|---|
| PR000252 001 | Tennant | 19814 | Walk Behind Scrubber Model 5700 | 1 | $10,439.35 |

**SCHEDULE NO. 464**

Equipment Location: GM Powertrain Division-Product Engineering, Ecores & Wiard, Gate 5 Entrance, Ypsilant, MI 48198.

| GM PR NUMBER | MANUFACTURER | SERIAL NUMBERS | TYPE AND MODEL OF EQUIPMENT | NUMBER OF UNITS | COST PER UNIT |
|---|---|---|---|---|---|
| PREJ3350 001 | IOTECH | 208324 | Vehicle Data Acquisition System Model WAVEBOOK 1516 | 1 | $19,860.00 |

## SCHEDULE NO. 474

Equipment Location: SPO #41 Fort Worth PDC, 301 Freedom Drive, Roanoke, TX 76262.

| GM PR NUMBER | MANUFACTURER | SERIAL NUMBERS | TYPE AND MODEL OF EQUIPMENT | NUMBER OF UNITS | COST PER UNIT |
|---|---|---|---|---|---|
| PR000341 001 | JLG | 0200103195 | Scissor Lift Model 2646E3 | 1 | $12,075.00 |

## SCHEDULE NO. 481

Equipment Location: GM MFD Indianapolis, 340 White River Parkwaywest Drive South, Indianapolis, IN 46222.

| GM PR NUMBER | MANUFACTURER | SERIAL NUMBERS | TYPE AND MODEL OF EQUIPMENT | NUMBER OF UNITS | COST PER UNIT |
|---|---|---|---|---|---|
| PR0007IN 001 | Taylor-Dunn | 150355 | Personnel Carrier Model R3-80 | 1 | $7,730.00 |
| PR0006IN 001 | Taylor-Dunn | 150325, 150326, 150327, 150328 | Personnel Carrier Model R3-80 | 4 | $7,194.50 |
| PR0005IN 001 | Taylor-Dunn | 150213 | Burden Carrier Model B2-48 | 1 | $12,615.00 |

## SCHEDULE NO. 485

Equipment Location: GM Powertrain Group, Massena Casting Plant, Route 37 East, Box 460, Massena, NY 13662-0460.

| GM PR NUMBER | MANUFACTURER | SERIAL NUMBERS | TYPE AND MODEL OF EQUIPMENT | NUMBER OF UNITS | COST PER UNIT |
|---|---|---|---|---|---|
| PRMRR498 001 | DOALL | 0101207X270 | Jet Lathe Model 1440ZX | 1 | $17,210.12 |

## SCHEDULE NO. 492

Equipment Location: SPO Chicago POC #02 1355 Remington Bolingbrook, IL 60440.

| GM PR NUMBER | MANUFACTURER | SERIAL NUMBERS | TYPE AND MODEL OF EQUIPMENT | NUMBER OF UNITS | COST PER UNIT |
|---|---|---|---|---|---|
| PR000302 001 | JLG | 0200104852 | Platform Lift Model 2646E2 | 1 | $12,025.00 |

## SCHEDULE NO. 495

Equipment Location: SMCO Saginaw, 1629 N. Washington Ave. Saginaw, MI 48601.

| GM PR NUMBER | MANUFACTURER | SERIAL NUMBERS | TYPE AND MODEL OF EQUIPMENT | NUMBER OF UNITS | COST PER UNIT |
|---|---|---|---|---|---|
| PR0020PS 001 | Taylor-Dunn | 147946 | Ambulance Model B2-48 | 1 | $15,063.00 |

## SCHEDULE NO. 496

Equipment Location: NACG Detroit/Hamtramck, 2500 E. GM Blvd. Detroit, MI 48211.

| GM PR NUMBER | MANUFACTURER | SERIAL NUMBERS | TYPE AND MODEL OF EQUIPMENT | NUMBER OF UNITS | COST PER UNIT |
|---|---|---|---|---|---|
| PR0008DT 001 | Taylor-Dunn | 149940 | Burden Carrier Model B2-48 | 1 | $8,038.00 |

## SCHEDULE NO. 501

Equipment Location: GMPT Flint Engine South, Receiving Dock F, 2100 Bristol Road, Flint, MI 48552.

| GM PR NUMBER | MANUFACTURER | SERIAL NUMBERS | TYPE AND MODEL OF EQUIPMENT | NUMBER OF UNITS | COST PER UNIT |
|---|---|---|---|---|---|
| PR0004PV 001 | JLG | 0200103528 | Scissor Lift Model 2646E3 | 1 | $13,963.00 |

## SCHEDULE NO. 503

Equipment Location: GMPT Flint Engine South, Receiving Dock F, 2100 Bristol Road, Flint, MI 48552.

| GM PR NUMBER | MANUFACTURER | SERIAL NUMBERS | TYPE AND MODEL OF EQUIPMENT | NUMBER OF UNITS | COST PER UNIT |
|---|---|---|---|---|---|
| PR0002PV 001 | Genie | 3697 | Manlift Model Z34/22N | 1 | $33,770.00 |
| PR0006PV 001 | Genie | 5571 | Narrow Aisle Articulating Boom Lift Model Z30/20 | 1 | $34,024.00 |

## SCHEDULE NO. 505

Equipment Location: NACG Oklahoma City, 7447 S.E. 74th Street, Oklahoma City, OK 73135.

| GM PR NUMBER | MANUFACTURER | SERIAL NUMBERS | TYPE AND MODEL OF EQUIPMENT | NUMBER OF UNITS | COST PER UNIT |
|---|---|---|---|---|---|
| PR0004OC 001 | Taylor-Dunn | 150114, 150115, 150116 | Burden Carriers Model B2-48 | 3 | $7,102.00 |

## SCHEDULE NO. 508

Equipment Location:  NACG Detroit/Hamtramck, 2500 E. GM Blvd., Detroit, MI 48211.

| GM PR NUMBER | MFG | SERIAL NUMBERS | TYPE AND MODEL OF EQUIPMENT | NUMBER OF UNITS | COST PER UNIT | INSTALLATION & APPROVAL FOR PAYMENT FORM "LEASE COMMENCEMENT DATE" |
|---|---|---|---|---|---|---|
| PR0010DT 001 | JLG | 0200103741, 0200103742 | SCISSOR LIFT MODEL 2658E3 | 2 | $14,575.00 | January 31, 2002 |
| PR0011DT 001 | LIFT-A-LOFT | AMR263 | AMR40-22 LIFT | 1 | $20,000.00 | December 04, 2001 |

## SCHEDULE NO. 510

Equipment Location: GM Service Parts Operation, Drayton Plains, PDC 78, 5280 Williams Lake Road, Waterford, MI 48329.

| GM PR NUMBER | MANUFACTURER | SERIAL NUMBERS | TYPE AND MODEL OF EQUIPMENT | NUMBER OF UNITS | COST PER UNIT |
|---|---|---|---|---|---|
| PRCW8393 001 | MTC | 065139 6779633 | Battery Handler Model PCE-2-32-QS-V-SG | 1 | $126,439.00 |

## SCHEDULE NO. 512

Equipment Location: GMTG Wentzville, 1500 East Route A, Wentzville, MO 63885.

| GM PR NUMBER | MANUFACTURER | SERIAL NUMBERS | TYPE AND MODEL OF EQUIPMENT | NUMBER OF UNITS | COST PER UNIT |
|---|---|---|---|---|---|
| PR0018WZ 001 | Taylor-Dunn | 150259, 150260, 150261, 150262, 150263, 150264, 150265, 150266 | Burden Carrier Model B2-48B | 8 | $7,458.00 |
| PR0018WZ 002 | Taylor-Dunn | 150267, 150268, 150269, 150270, 150271, 150272, 150273, 150274 | Burden Carrier Model B2-48B | 8 | $7,458.00 |
| PR0018WZ 003 | Taylor-Dunn | 150275, 150276, 150277, 150278, 150279, 150280, 150281, 150282, 150283 | Burden Carrier Model B2-48B | 9 | $7,458.00 |

## SCHEDULE NO. 513

Equipment Location: GMTG  Wentzville, 1500 E. Route A, Wentzville, MO 63885.

| GM PR NUMBER | MANUFACTURER | SERIAL NUMBERS | TYPE AND MODEL OF EQUIPMENT | NUMBER OF UNITS | COST PER UNIT |
|---|---|---|---|---|---|
| PR0017WZ 001 | Taylor-Dunn | 150490, 150491, 150492, 190493 | Burden Carrier Model B2-10 "EE" | 4 | $9,756.00 |

## SCHEDULE NO. 514

Equipment Location: GMPT Bay City, 100 Fitzgerald Street, Bay City, MI 48708.

| GM PR NUMBER | MANUFACTURER | SERIAL NUMBERS | TYPE AND MODEL OF EQUIPMENT | NUMBER OF UNITS | COST PER UNIT |
|---|---|---|---|---|---|
| PR0006BC 001 | Taylor-Dunn | 150258 | Personnel Carrier Model R3-80 | 1 | $6,137.00 |
| PR0007BC 001 | Taylor-Dunn | 150252, 50253, 150254, 150255, 150256 | Personnel Carrier Model B2-48 | 5 | $6,866.00 |
| PR0008BC 001 | Taylor-Dunn | 150257 | Personnel Carrier Model SS5-34 | 1 | $4,640.00 |
| PR0009BC 001 | Taylor-Dunn | 150488 | Personnel Carrier Model R3-80 | 1 | $8,564.00 |
| PR0010BC 001 | Taylor-Dunn | 150489 | Burden Carrier Model R3-80 | 1 | $8,564.00 |

## SCHEDULE NO. 518

Equipment Location: NACG Oklahoma City, 7447 S.E. 74th Street, Oklahoma City, OK 73135.

| GM PR NUMBER | MANUFACTURER | SERIAL NUMBERS | TYPE AND MODEL OF EQUIPMENT | NUMBER OF UNITS | COST PER UNIT |
|---|---|---|---|---|---|
| PR0010OC-001 | Taylor-Dunn | 150569, 150570, 150571, 150572, 150573, 150574, 150575, 170576, 150577, 170578, 150579, 150580, 150581, 150582 | Personnel Carrier Model SS5-34 | 14 | $4,640.00 |

## SCHEDULE NO. 519

Equipment Location: NACG Bowling Green, 600 Corvette Drive, Bowling Green, KY 42101.

| GM PR NUMBER | MANUFACTURER | SERIAL NUMBERS | TYPE AND MODEL OF EQUIPMENT | NUMBER OF UNITS | COST PER UNIT |
|---|---|---|---|---|---|
| PR0006BG-001 | Taylor-Dunn | 150564, 150565, 150566, 150567, 150568 | Personnel Carrier Model SS5-34 | 5 | $5,085.00 |

## SCHEDULE NO. 520

Equipment Location: NACG Bowling Green, 600 Corvette Drive, Bowling Green, KY 42101.

| GM PR NUMBER | MANUFACTURER | SERIAL NUMBERS | TYPE AND MODEL OF EQUIPMENT | NUMBER OF UNITS | COST PER UNIT |
|---|---|---|---|---|---|
| PR0007BG 001 | Taylor-Dunn | 150893, 150894, 150895, 150896, 150897, 150898, 150899, 150900, 150901, 150902, 150903, 150904 | Model B2-48 Burden Carriers | 12 | $7,458.00 |

## SCHEDULE NO. 521

Equipment Location:  NACG Oklahoma City, 7447 S.E. 74th St., Oklahoma City, OK  73135

| GM PR NUMBER | MANUFACTURER | SERIAL NUMBERS | TYPE AND MODEL OF EQUIPMENT | NUMBER OF UNITS | COST PER UNIT |
|---|---|---|---|---|---|
| PR00070C-001 | Taylor-Dunn | 150557, 150558, 150559, 150560, 150561, 150562, 150563 | Personnel Carrier Model SS5-34 | 7 | $4,640.00 |

## SCHEDULE NO. 522

Equipment Location:  NACG Oklahoma City, 7447 S.E. 74th St., Oklahoma City, OK  73135

| GM PR NUMBER | MANUFACTURER | SERIAL NUMBERS | TYPE AND MODEL OF EQUIPMENT | NUMBER OF UNITS | COST PER UNIT |
|---|---|---|---|---|---|
| PR00080C-001 | Taylor-Dunn | 150875, 150876, 150877, 150878, 150879, 150880, 150881, 150882, 150883, 150884, 150885, 150886, 150887, 150888, 150889, 150890, 150891, 150892 | Model B2-54 Burden Carriers | 18 | $10,822.00 |

## SCHEDULE NO. 523

Equipment Location:  NACG Oklahoma City, 7447 S.E. 74th St., Oklahoma City, OK  73135

| GM PR NUMBER | MANUFACTURER | SERIAL NUMBERS | TYPE AND MODEL OF EQUIPMENT | NUMBER OF UNITS | COST PER UNIT |
|---|---|---|---|---|---|
| PR00060C-001 | Taylor-Dunn | 150858, 150859, 150860, 150861, 150862, 150863, 150864, 150865, 150866, 150867, 150868, 150869, 150870, 150871, 150872, 150873, 150874 | Model B2-54 Burden Carriers | 17 | $10,100.00 |

## SCHEDULE NO. 524

Equipment Location: NACG Oklahoma City, 7447 S.E. 74th St., Oklahoma City, OK  73135

| GM PR NUMBER | MANUFACTURER | SERIAL NUMBERS | TYPE AND MODEL OF EQUIPMENT | NUMBER OF UNITS | COST PER UNIT |
|---|---|---|---|---|---|
| PR00090C-001 | Taylor-Dunn | 150541, 150542, 150543, 150544, 150545, 150546, 150547, 150548, 150549, 150550, 150551, 150552, 150553, 150554, 150555, 150556 | Model SS5-34 Personnel Carrier | 16 | $5,061.00 |

## SCHEDULE NO. 525

Equipment Location: GMPT Willow Run, Ecorse and Wiard Road, Ypsilanti, MI 48198.

| GM PR NUMBER | MANUFACTURER | SERIAL NUMBERS | TYPE AND MODEL OF EQUIPMENT | NUMBER OF UNITS | COST PER UNIT |
|---|---|---|---|---|---|
| PR0005HW 001 | Taylor-Dunn | 150502, 150503, 150504, 150505, 150506, 150507, 150508, 150509, 150510, 150511, 150512 | Personal Carrier Model R3-80 | 11 | $6,665.00 |

## SCHEDULE NO. 526

Equipment Location: GMPT Willow Run, Ecorse and Wiard Road, Ypsilanti, MI 48198.

| GM PR NUMBER | MANUFACTURER | SERIAL NUMBERS | TYPE AND MODEL OF EQUIPMENT | NUMBER OF UNITS | COST PER UNIT |
|---|---|---|---|---|---|
| PR0006HW 001 | Taylor-Dunn | 150533 through 150540 | Burden Carriers Model B2-48 | 8 | $7,458.00 |

## SCHEDULE NO. 529

Equipment Location: GMPT Willow Run, Ecorse and Wiard Road, Ypsilanti, MI 48198.

| GM PR NUMBER | MANUFACTURER | SERIAL NUMBERS | TYPE AND MODEL OF EQUIPMENT | NUMBER OF UNITS | COST PER UNIT |
|---|---|---|---|---|---|
| PR009HW 001 | Taylor-Dunn | 150513 | Personal Carrier Model R3-80 | 1 | $6,775.00 |

**SCHEDULE NO. 531**

Equipment Location: GMPT Defiance, 26427 State Route 281 East, Defiance, OH 43512-0070.

| GM PR NUMBER | MANUFACTURER | SERIAL NUMBERS | TYPE AND MODEL OF EQUIPMENT | NUMBER OF UNITS | COST PER UNIT |
|---|---|---|---|---|---|
| PR0023PD 001 | Giliberti, Inc. | J0225 159835 AND J0225 159836 | Ambulances Model MJIII | 2 | $20,500.00 |

**SCHEDULE NO. 532**

Equipment Location: Allison Transmission, Dock 33 Garage, 4700 W. 10th Street, Indianapolis, IN 46222.

| GM PR NUMBER | MANUFACTURER | SERIAL NUMBERS | TYPE AND MODEL OF EQUIPMENT | NUMBER OF UNITS | COST PER UNIT |
|---|---|---|---|---|---|
| PR0048AL 002 | Tennant | 2456 | Sweeper Model 6200 | 1 | $16,054.00 |

**SCHEDULE NO. 535**

Equipment Location: GMPT Wentzville, 1500 East Route A, Wentzville, MO 63885.

| GM PR NUMBER | MANUFACTURER | SERIAL NUMBERS | TYPE AND MODEL OF EQUIPMENT | NUMBER OF UNITS | COST PER UNIT |
|---|---|---|---|---|---|
| PR0023WZ 001 | Motion Savers | 150918 thru 150921 | Burden Carriers Model B2-54 | 4 | $11,105.00 |
| PR0024WZ 001 | Motion Savers | 150922 thru 150925 | Burden Carriers Model B2-54 | 4 | $11,105.00 |

**SCHEDULE NO. 536**

Equipment Location: GMPT Toledo, 1455 W. Alexis Road, Toledo, OH 43612-0909.

| GM PR NUMBER | MANUFACTURER | SERIAL NUMBERS | TYPE AND MODEL OF EQUIPMENT | NUMBER OF UNITS | COST PER UNIT |
|---|---|---|---|---|---|
| PR0060TT 001 | Taylor Dunn | 150799 | Personnel Carrier Model R3-80 | 1 | $6,544.00 |

## SCHEDULE NO. 537

Equipment Location: GMPT Warren, 23500 Mound Road, Warren, MI 48091.

| GM PR NUMBER | MANUFACTURER | SERIAL NUMBERS | TYPE AND MODEL OF EQUIPMENT | NUMBER OF UNITS | COST PER UNIT |
|---|---|---|---|---|---|
| PR0024WA 001 | Taylor Dunn | 150926, 150927, 150928, 150929, 150930 | Burden Carrier Model B2-48 | 5 | $7,458.00 |

## SCHEDULE NO. 543

Equipment Location: GMTG Wentzville, 1500 East Route A, Wentzville, MO 63885.

| GM PR NUMBER | MANUFACTURER | SERIAL NUMBERS | TYPE AND MODEL OF EQUIPMENT | NUMBER OF UNITS | COST PER UNIT |
|---|---|---|---|---|---|
| PR0025WZ 001 | Taylor-Dunn | 142427 | Burden Carrier Model B2-48 | 1 | $7,458.00 |

# BILLING AND COLLECTING AGREEMENT

This BILLING AND COLLECTING AGREEMENT ("Agreement") is dated as of July 2, 2002 among Stamford Computer Group Inc. ("Assignee"), CIT Technologies Corporation, d/b/a CIT Systems Leasing, a Michigan corporation ("Systems Leasing"), and Commerce Bank, N.A. ("Assignee's Financer").

## RECITALS

A. Systems Leasing, as assignee of The LGR Group, Inc., as Lessor, and General Motors Corporation ("Lessee"), as Lessee, have entered into a Master Lease Agreement dated March 17, 2000 (the "Master Lease"). Pursuant to the Master Lease, Systems Leasing and Lessee have entered into the following Equipment Schedules as referenced on Exhibit A attached hereto and made a part hereof (collectively, the "Schedules"; a Schedule collectively with the Master Lease as applicable thereto is referred to as a "Lease") providing for the lease of the equipment described therein (collectively, the "Equipment"):

| Equipment Schedule No. | Final Payment Due Date | Monthly Rental |
|---|---|---|

### SEE EXHIBIT B ATTACHED HERETO AND MADE A PART HEROF

B. Pursuant to Equipment Schedule No. 2 to Master Sale Agreement dated as of November 5, 2001 between Assignee, as Purchaser, and Systems Leasing, as Seller (such Equipment Schedule and such Master Sale Agreement, as applicable thereto, collectively, the "Assignment Agreement") Systems Leasing is, concurrently with the entering to of this Agreement, assigning all or part of its right, title, or interest in the Leases and the Equipment to Assignee, and is assigning all or part of its right, among other things, to receive all rentals and other payments due under the Leases from and after July 1, 2002 (the "First Assigned Rent Payment Due Date"), to Assignee, all as more particularly described therein.

C. Pursuant to one or more Notice(s) of Assignment (collectively, the "Notice of Assignment") delivered in connection with the Leases and the Assignment Agreement, Lessee has agreed to pay rent coming due on and after the First Assigned Rent Payment Due Date and all other nonrent amounts due and to become due under the Leases (collectively, "Lease Payments") to Assignee as assignee of Systems Leasing. Lessee desires to make all respective payments due under the Leases and other leases in connection with the Master Lease to one person (Systems Leasing).

D. Pursuant to certain financing documentation between Assignee and Assignee's Financer (in which Systems Leasing has no interest and with respect to the particulars of which Systems Leasing shall be deemed to have no knowledge) (collectively, the "Financing Documentation") Assignee has assigned certain of its interest and rights in the Leases and the Equipment to Assignee's Financer and/or granted a lien in certain of its interests and rights as collateral for certain of its obligations to Assignee's Financer.

E. The parties desire to accommodate Lessee and Systems Leasing in Systems Leasing's relationship with Lessee by providing that Systems Leasing shall, and shall have the right to, bill for, collect, and administer Lease Payments as more particularly provided in this Agreement.

1

AGREEMENT

1.      In General.  The parties hereby agree that Systems Leasing shall have the exclusive right and obligation, at its expense, to bill for and to receive and administer all Lease Payments, including rent and tax payments on rent due under the Leases, all on the terms and conditions set forth in this Agreement.

2.      Billing and Collecting of Lease Payments.  All billing will be consistent with Systems Leasing's usual billing practices with respect to Lessee.  If Lessee fails to pay any Lease Payment when due, Systems Leasing may use its usual collection procedures to collect such Lease Payment.

3.      Administration of Received Amounts.  All Lease Payments actually received by Systems Leasing shall be remitted promptly, and in any event within 5 days of Systems Leasing's receipt of collected funds received from Lessee, including any taxes on rents (collectively, "Received Amounts"), to Assignee's Financer or, after Assignee's Financer shall have notified Systems Leasing of the termination of its interest in Lease Payments, to Assignee.  Systems Leasing shall remit Received Amounts by check by overnight courier addressed to the following address (or to such other address of which Systems Leasing has been given at least 10 business days prior notice of), or by wire transfer in accordance with the following instructions (or such other instructions of which Systems Leasing has been given at least 10 business days prior notice of):

|  | Payments to Assignee: | Payments to Assignee's Financer: |
|---|---|---|
| By Wire Transfer: | Account of Stamford Computer Group Inc. J.P. Morgan Chase Bank 270 Park Avenue, New York, NY ABA: 021000021 Account: 5632000211 203-368-5041 Contact Tina Besse | Commerce Bank, N.A. St. Louis, MO ABA: 101000019 Account: 19904 LEASE |
| By Check: | Stamford Computer Group Inc. 74 West Park Place Stamford, CT 06901 Attn: Accounting Department | Commerce Bank, N.A. P.O. Box 11309 St. Louis, MO 63105-1309 Or Commerce Bank, N.A. 8000 Forsyth Blvd., Ste 200 St. Louis, MO 63105 Attn: Roger May |

Systems Leasing shall upon request identify to  the party to whom it has remitted Received Amounts what it believes to be the separate Lease Payments to which the Received Amounts remitted should be applied, specifying the payment amount and applicable Lease and rental period.  Systems Leasing shall be under no obligation with respect to the application of any Received Amounts to any Lease Payments by any person.